STUART M. ROBSON, administrator with the will annexed, *vs.* EDWIN F. LYFORD, executor.

Hampden.     September 25, 1917. — October 23, 1917.

Present: RUGG, C. J., BRALEY, DE COURCY, & PIERCE, JJ.

*Evidence,* Of survival, Circumstantial, Remoteness, Competency, Opinion.

In an action of contract against an executor by the administrator with the will annexed of the alleged widow of the defendant's testator for the amount of certain legacies bequeathed to her as such widow, it appeared that the husband

and wife when seated in the tonneau of a limousine motor car were killed by a collision with a steam railroad train running at great speed, and the defendant contended that the plaintiff's testatrix never became entitled to the legacies because she did not survive her husband. It appeared that the husband was eighty and the wife seventy-three years of age and that at the time of the accident the general condition of health of the wife was much better than that of her husband, that they were sitting at some distance apart on the rear seat, each in the respective corner, the husband at the extreme right and the wife at the extreme left hand side of the motor car, that the motor car first was struck by the engine of the train on its rear right hand wheel, that the right hand side of the car was crushed, that the left hand side was comparatively uninjured and that the chauffeur, who was driving on the left hand side, was injured only slightly by being thrown out, and there was evidence on which it could have been found that, while the husband was killed instantly by the engine, the death of the wife was not caused by contact with the engine but was caused after the collision by having the top of her skull cut off by some part of the motor car when she was thrown to the ground. *Held,* that there was evidence for the jury that the plaintiff's testatrix survived her husband and became entitled to the legacies.

In the same case the chauffeur who was operating the car at the time of the accident was a witness at the trial. He testified, subject to the defendant's exception, that when they were at a certain point on the road, which was two miles in distance and ten minutes in time from the place and time of the collision, the husband sat "kind of right around sideways, in the rounding part of the car," that the wife sat "at the extreme edge of the seat on her side, at the extreme end" and that there was quite a space between them along the width of the rear seat. *Held,* that, considered in the light of connecting evidence, this testimony of the chauffeur was not too remote as matter of law, was material evidence and was admitted rightly.

In the same case, the presiding judge had asked a physician, who was testifying as a witness, "Would the difference, if any, in their vigor of health or the lack of it cut any figure in determining in your professional opinion as to whether either survived the other, in view of their injuries as you saw their bodies respectively?" The witness answered, "Yes, sir." This question and answer were not objected to. Afterwards another physician, subject to the defendant's exception, was allowed to testify that immediately before the day of the accident the wife was in a better condition of health than her husband. *Held,* that the evidence was competent upon the issue of survival; but that, if it was immaterial, the defendant, in the light of the other evidence on the question of survival, was not harmed by it within the meaning of St. 1913, c. 716, § 1.

CONTRACT by an administrator with the will annexed of the estate of Elizabeth T. Porter, alleged to have been the widow of Sherman D. Porter, against the executor of the will of Sherman D. Porter, to recover the amount of the legacies bequeathed to the plaintiff's testatrix by the will of the defendant's testator. Writ dated September 19, 1914.

The clause of the will of Sherman D. Porter under which the

legacies were claimed was as follows: "First. To my wife, Elizabeth T. Porter, I give and bequeath the sum of Fifty Thousand ($50,000) Dollars, also all my household furniture, furnishings, books, pictures, watches, jewelry, ornaments, clothing and all my household goods, and personal property about my homestead, also all my robes, blankets, automobile and other articles of personal property about my barn, not including in this bequest and gift, however, any cash, stocks, bonds, notes, choses in action, or similar property, except said sum of Fifty Thousand ($50,000) Dollars, not including my clock in the hall of my house."

The defendant's amended answer denied that the plaintiff's testatrix survived the defendant's testator or ever became his widow.

In the Superior Court the case was tried before *King*, J. The evidence is described in the opinion. At the close of the evidence the defendant asked the judge to rule that on the pleadings and on the evidence the plaintiff could not recover. The judge refused to make this ruling, and submitted the case to the jury, concluding his charge as follows:

"If Mrs. Porter survived him [her husband] by the minutest fraction of time that is conceivable, that is sufficient time for that legacy to vest in her; and if it vested in her and she then, or immediately thereafter, died, it passes under her will. And it is upon that theory that this suit is brought. . . .

"Then the whole controversy before you, gentlemen, is which of these two, husband or wife, survived the other, if either did survive? But you cannot find a verdict for the plaintiff, whatever your wish may be in the matter, unless you are satisfied upon all the evidence that she survived her husband by some fraction of time however small.

"If you are satisfied upon all the evidence before you, taking into account the spoken word of every witness, taking into account not only what the persons said upon the witness stand but how they said it, taking into account the probabilities or improbabilities of what they said, taking into account every fair inference which you may draw from that testimony, — if you can say . . . that upon that you are satisfied that she survived, she, Mrs. Porter, survived her husband by the minutest fraction of time, that is sufficient, and the plaintiff is entitled to the sum I have

specified. If you cannot say that, that is not sufficient, and your verdict must be for the defendant."

The jury returned a verdict for the plaintiff in the sum of $55,901.50; and the defendant alleged exceptions, as explained in the opinion.

*C. H. Beckwith (R. H. Tilton* with him,) for the defendant.

*W. H. McClintock, (D. B. Hoar* with him,) for the plaintiff.

PIERCE, J. This is an action of contract brought under R. L. c. 141, § 19, by the administrator *de bonis non cum testamento annexo* of the estate of Elizabeth T. Porter against the executor of the will of Sherman D. Porter, to recover a pecuniary legacy of $50,000 and a specific legacy of personal property of the agreed value of $2,238.75.

The sole question of fact in the case is, Did Mrs. Porter survive Mr. Porter? The presiding judge submitted this question of fact to the jury against the defendant's request for a ruling that a verdict should be ordered for the defendant.

The case is brought before this court on the defendant's exception to the refusal to rule that a verdict should be ordered for the defendant and upon exceptions taken to the admission of certain testimony of Fred W. Bennett and of that of Dr. George S. Stebbins. All other exceptions taken at the trial were waived at the hearing before the full court.

The material facts upon the testimony which could have been found by the jury are as follows:

Sherman D. Porter and Elizabeth T. Porter, his wife, lost their lives on August 26, 1913, in a common disaster consisting of a collision between a Knox limousine automobile in which they were driving and a train on the Boston and Maine Railroad at Bryant's Crossing in South Deerfield, Massachusetts. The train was an express passenger train going south toward Springfield on the west or south bound track, there being two tracks at the point of the accident. The automobile was coming south on the highway which runs practically parallel to the Boston and Maine Railroad tracks from South Deerfield Centre to a point a little north of Bryant's Crossing where it turns and crosses the railroad tracks at an angle of about twenty-five degrees.

Mr. and Mrs. Porter had left Greenfield for Springfield some time between two and two-thirty o'clock in the afternoon. They

both sat on the rear seat of the limousine in the tonneau, Mr. Porter in the right hand corner and Mrs. Porter in the left, with quite a space between them.   At the South Deerfield Post Office, which is from one quarter to one third of a mile north of the point of the collision, Mr. Porter's chauffeur, Bennett, noticed Mr. Porter sitting back in the right hand corner of the seat, slouched down somewhat, his head turned slightly to the left and resting against the rear right hand corner.   About seventy paces north of the point of the collision the Porter limousine passed one Melendy, who was going south on the highway in a carriage.   Melendy testified that after the Porter automobile passed him he saw Mrs. Porter lean forward as if to touch the chauffeur and immediately resume her former position in the left hand corner of the seat.   The Porter automobile was going in the same direction as the Melendy carriage and passed the latter on Melendy's right, the wrong side of the road.   Mrs. Porter was sitting in the corner nearest Melendy, that is, the left hand corner of the automobile, and was certainly back in her seat at the moment of the collision. Melendy saw the collision and testified that the train struck the automobile on the rear right wheel or immediately behind it.

The collision was also seen by one Mann, who testified that the engine struck the automobile about the rear of the right hand side, the impact being between the corner and the rear wheel on the right hand side, that is between the extreme corner and the wheel, directly back of the rear right wheel.

Melendy and Mann were the only eyewitnesses of the collision who undertook to testify as to the point of the impact.

The speed of the train at the moment of the collision was approximately fifty miles an hour and that of the automobile from twelve to fifteen miles per hour.

Mr. and Mrs. Porter were carried down the track approximately two hundred and fifty to two hundred and seventy-five feet before being deposited on the ground on the westerly side of the south bound track.   Various persons went down the track to where Mr. and Mrs. Porter were, the earliest arriving at the spot not less than a minute after the collision.   No sign of life was then observed in either Mr. or Mrs. Porter.

Bennett, the chauffeur, who at the moment of the collision was sitting in the driver's seat on the left hand side of the automobile,

directly in front of Mrs. Porter, was found about twenty to thirty feet south of Mr. and Mrs. Porter only slightly injured and has since recovered. Various parts of the automobile were deposited along the ground on the westerly side of the south bound track, a small part of it being south, but most of it north of the bodies. None of the parts of the automobile were found east of the south bound track, except a spare tire which, before the collision, rested in a tire carrier fastened to the rear of the automobile. Mrs. Porter's hat was found on the easterly side of the south bound track at a point about opposite, or slightly south of the point where the bodies of Mr. and Mrs. Porter lay, and when found had a switch of artificial hair attached to it and both the hair and the hat were clean and in good condition. Near her body were also found a lady's handbag, which was open, and a purse, lady's watch and side comb and a few coins.

Mr. Porter's body lay about ten feet west of the westerly or south bound track, and not quite at right angles to it. Mrs. Porter's body was close to Mr. Porter's, her feet being about four feet to the left of Mr. Porter's feet and her head toward the highway and about ten feet from his head. Neither body had the appearance of having been rolled upon the ground.

The back of Mr. Porter's head was crushed in from a point near the top of the head to the base of the skull, and the skull was a pulpy mass, the bone being broken into small pieces and the brain oozing from it. The medulla oblongata was badly crushed and the floor of the skull was all broken. The right collar bone was broken, both legs were broken above the ankle, the bone of the left leg protruding through the flesh, the left arm was broken, the ribs were crushed in, those on the right side more than those on the left, and the sternum crushed in and flattened. Mr. Porter's body was much more limp than that of Mrs. Porter.

Mrs. Porter's skull was cut off almost horizontally at a point about level with or just over the eyes, the cut extending around on both sides above the top of the ears and on the same level continued clear around the skull. The cut was described as being about as clean a cut as would be made at an autopsy. The top of the skull, although cut off, was not completely severed from the head but remained attached to it by a hinge of scalp in the middle of the back of the head. The top of the skull so cut off

did not rest upon the part from which it was cut, but was opened back like the top or cover upon an open box. Nearly, if not quite all of Mrs. Porter's brains were out of her skull so that the floor or base of the skull was exposed to view. About eighteen inches to two feet directly behind her head, her brains, about a quart in quantity, were found in a puddle. Both her arms were broken at the wrists. One Hackley, an undertaker who removed the bodies from the side of the track, scooped up Mrs. Porter's brains and put them into her skull and replaced the top of the skull without severing it from the remainder. The bodies were taken to Springfield on the day of the accident.

When Mr. Porter's body was examined at Springfield, the whole top of the head had fallen in, the brains had run out and the cranium had been cleaned of all its contents. The skull had been broken into very fine pieces, "too fine to be of any use," as the undertaker described it. The pieces of the skull had fallen out, some into the transportation case and some were clinging to the body. The scalp had dropped into the cavity of the head. The skull was broken over to the centre of the forehead from the top of the neck in the rear. The medulla was gone, and the bony structure surrounding the foramen magnum (the opening in the back part of the base of the skull through which the spinal cord passes) was shattered so that the bones had dropped away and were unrecognizable.

When Mrs. Porter's body was examined at Springfield it was found that her skull was entirely devoid of contents and that the top of the skull had been severed from the rest of it.

On the afternoon of the accident, before the wreckage was removed, two photographs were taken by a newspaper reporter and were introduced in evidence.

The wreckage of the automobile was removed to Springfield and was there stored in a barn on Elliott Street where it was at the time of the trial in substantially the same condition as immediately after the accident. The jury had a view of all the wreckage and certain parts of it were introduced in evidence at the trial and also exhibited to this court. An inspection thereof disclosed that the rear right hand corner of the automobile, in which Mr. Porter was sitting, that is, that part starting at a point just back of the rear right hand tonneau door and extending back

beyond the rear right hand corner where the back board or sill of
the rear seat connects (on the right) with the corner in the rear,
was broken into such small pieces that it could not be identified.
The same was true of the back of the car from the chassis frame
to the top with the exception of two parts, namely, the left rear
corner and part of the sill under the rear window, being of the
same level at the back as the sill under the left side window of
the limousine.  The right rear corner of the top was gouged out
and was missing, leaving an irregular splintered boundary to the
other part.  The missing part was that extending from the rear
right hand corner of the top almost to the middle line of the
top drawn lengthwise and from the back toward the front corner
a distance of between four and five feet.  The rest of the top was
intact except that it was somewhat cracked.

Both of the right hand wheels of the automobile were broken,
the right rear wheel being the most damaged of all four wheels.
The tire on the right rear wheel and on the right front wheel were
both broken but the tires on the left side wheels were not broken
and at the trial were still inflated with the air that was in them on
the day of the accident, as was also the spare tire carried in the
rear of the automobile, which was found on the east side of the
tracks comparatively uninjured, having probably been wrenched
loose at the first instant of the impact.  The rear end of the rear
right hand mudguard was bent down and buckled up and there
was a mark, evidently of a hexagonal nut or bolthead, imprinted
on it.  The rear channel bar or crossbar of the chassis frame was
broken at a point eleven inches to the left of the rear right corner
and at the point of fracture there was a heavy dent from the out-
side to the middle, running from the rear toward the front.  This
channel bar is between thirty-five and thirty-six inches in length.
The tire carriers which were fastened to the rear of the car were
easily recognizable, the left hand one being in very good condition,
but the right hand one bent inward.

The left hand rear side and corner, in which Mrs. Porter was
sitting, is one of the largest pieces.  This left rear piece consist-
ing of wood and aluminum extended from the left side of the rear
window around to the left rear door and still retains its identity.
When the photograph Exhibit 7 was taken, a part of the sill
under the rear window was apparently still attached to the left

rear side of the limousine. This part spans more than half the distance across the back starting from the left hand side. This part of the sill would be behind a person sitting in the left rear corner, where Mrs. Porter was sitting when last seen. When brought into court, however, it had in some manner become detached from the left rear corner.

After the collision, the right hand side of the pilot of the locomotive was found to be bent down and to the left. It was bent in on the right hand side and some of the spokes on the right of the centre of the pilot were broken, and the lower right hand double step (two steps cast in one piece) was almost ripped off, being left hanging by one bolt. There was a large quantity of crushed or broken glass on the front right side of the locomotive and the tops of two bolts of the right hand cross-head arm had been sheared off. The left hand side of the locomotive was uninjured.

Mr. Porter was eighty years old, was about six feet in height and weighed over two hundred and fifty pounds, and Mrs. Porter was seventy-three years old and weighed about one hundred and thirty-five pounds and was about five feet five inches to five feet six inches in height. Mr. Porter before the accident had been suffering from chronic bronchitis and arteriosclerosis and from high blood pressure. He had a chronic enlarged prostate gland which had required irrigation of the bladder for some years back. Mrs. Porter, about a year before the accident, had had a slight numbness in her side for three or four days, not, however, enough to keep her from walking about the house and attending to her duties. She complained somewhat of indigestion, but not of acute indigestion. Her general condition of health was much better than that of Mr. Porter. The evidence was conflicting on the question whether there was any human hair or tissue found upon any part of the locomotive after the accident, but the jury could have found there was none on the testimony of the engineer Pecord.

The testimony of the chauffeur, Bennett, that when they resumed their journey, after a delay of fifteen minutes at the roadside in South Deerfield at a point a mile and three fourths or two thirds north of the South Deerfield Post Office and two miles in distance and ten minutes in time measured by the rate of speed

of the automobile from the point of collision, Mr. Porter sat "kind of right around sideways, in the rounding part of the car, partly against the side and partly against the back, against the curve of the car, mainly against the curve of the car," and that Mrs. Porter sat "at the extreme edge of the seat on her side, at the extreme end" and that there was quite a space between Mr. and Mrs. Porter along the width of the rear seat, was not too remote as a matter of law. And when considered in connection with the testimony as to the position in the car taken by them from the time the car left Greenfield until the car stopped by the roadway in South Deerfield, in connection with the position occupied by Mr. Porter at the South Deerfield Post Office, as also their relative positions as seen by Melendy seventy paces north of the crossing and by Cunningham one hundred and fifty feet north of the crossing, together with the probability, as the jury could find, that persons of their age and somewhat impaired physical vigor would be likely to avail themselves of the support afforded by the sides and back of the car, was material, and therefore rightly submitted to the jury in support of the contention of the plaintiff that at the moment of the collision Mr. and Mrs. Porter respectively sat at the extreme right and left hand side of the rear seat of the automobile.

The testimony of Dr. Stebbins that immediately before August 26, 1913, Mrs. Porter was in better condition of health than Mr. Porter was, manifestly was offered and admitted in consequence of the answer "Yes, sir" of Dr. Twitchell to the question of the presiding judge, "Would the difference, if any, in their vigor of health or the lack of it cut any figure in determining in your professional opinion as to whether either survived the other, in view of their injuries as you saw their bodies respectively?" It is to be observed that the question to Dr. Twitchell and his answer were put and received without objection. We think the evidence was competent to meet the possible, the in fact actual, contention of the defendant that husband and wife came to simultaneous and instantaneous death as the result of the same form of violence inflicted upon each of them at the same point of time. We are also of opinion that the defendant was not harmed by the admission of the testimony if the evidence was immaterial. St. 1913, c. 716, § 1.

Upon all the evidence the jury would be warranted in finding that the locomotive struck the automobile at the rear of the right hand wheel; that the force of the impact crushed the side of the right side of the car, and the head of Mr. Porter in such a manner that his death was instantaneous; that following the impact the automobile took up the velocity of the train at a point and time sufficiently early to prevent its being injured any more than it was, and that Mrs. Porter's body and Bennett's body, which were inside the car, took up the same velocity at the same time. It would be warranted in finding that the automobile and the bodies of the inmates of the car were carried down the track two hundred and fifty to two hundred and seventy-five feet and then dropped to the ground. It would be warranted in finding that Mrs. Porter did not receive her mortal wound while within the car from the evidence as to her position therein at the moment of collision, in connection with the evidence to be inferred from the comparatively uninjured condition of the left side of the car and the escape of Bennett with slight injuries. It would be warranted in finding that the top of the skull of Mrs. Porter was cut off by some part of the automobile and not by contact with the engine by the nature of the cleavage. It would be warranted in finding that the skull was not cut off before Mrs. Porter was thrown to the ground by the testimony, if believed, that "the brain would be spilled immediately upon the taking off of the dome of the skull." It would finally be warranted in finding that the injury to the skull occurred when she was dropped or thrown from the train by the testimony, if believed, that in that event, the brains would be found, as they were, "within a few feet of the point of the accident, of where she fell."

Without further analysis of the long record it is plain that there was evidence of a substantial character to support the position of the plaintiff.

*Exceptions overruled.*