# Sweeney's Estate.  O'Neil's Appeal.

*Decedents' estates—Victims of common disaster—Survivorship— Lack of presumption—Necessity of proof—Effect of failure to prove survivorship.*

The rule of the common law is that when two or more persons perish in the same disaster, and there is no fact or circumstance to prove which survived, there is no presumption whatever on the subject.  None arises from considerations of age or sex, and the law will no more presume that all died at the same instant than it will presume that one survived the other.  It treats the case as one to be established by evidence, and lays the burden of proof on him who claims survivorship.

In the absence of evidence from which the contrary may be inferred, all may be considered to have perished at the same moment; not because that fact is presumed, but because, from failure to prove the contrary by those asserting it, property rights must necessarily be settled on that theory.  If there are other circumstances shown, tending to prove survivorship, courts will then look at the whole case for the purpose of determining the question, but if only the fact of death by a common disaster appears they will not undertake to solve it on account of the nature of the question, and its inherent uncertainty.

When a father and daughter are found dead, the result of inhaling escaping illuminating gas, and there is not sufficient legal evidence on which to base a conclusion that the daughter survived her father, it necessarily follows that title to the father's property did not prima facie vest in the daughter.

Argued December 9, 1921.  Appeal, No. 154, Oct. T., 1921, by Gabrielle O'Neil, from decree of O. C. Phila. Co., Jan. T., 1921, No. 257, sustaining exceptions to adjudication in the Estate of Morgan Sweeney, deceased. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, TREXLER, KELLER and LINN, JJ.  Affirmed.

Exceptions to adjudication.  Before GUMMEY, J.

The facts are stated in the opinion of the Superior Court.

The auditing judge found that the daughter survived her father, the decedent in this case, and awarded the balance in the hands of the administratrix of the decedent to the administratrix of the estate of the daughter.

On exceptions to the adjudication, the court in banc sustained the exceptions, and awarded the balance in the hands of the administratrix of the decedent to the collateral heirs of the decedent.

*Error assigned* was the decree of the court.

*Thomas H. McCaffrey,* for appellant.—The evidence submitted to the auditing judge was amply sufficient to require him to draw an inference and conclude that Mary Agnes Kelly survived her father: Corpus Juris, 17 Vol. p. 1180; Coye et al. v. Philo Leach, Admr. 8th Metcalf's Repts. 371; Underwood v. Wing, 4th De Gex Macnaghten and Gordon's Reports, 633; Broome et al. v. Duncan, 29 Southern Reporter 394; Smith v. Groome, 7th Florida 81; Will of Abram Ehle, Estate of James A. Ehle, 73 Wis. 445; Robson v. Lyford, 228 Mass. 318; Engelbirt's Will, 171 N. Y. Suppl. 788; Gillespie's Est., 24 Pa. Dist. Repts. 376; McInnes, 119 Appellate Division Reports, Supreme Court, N. Y. 440; St. John v. Andrew's Institute, 117 Appellate Division Reports, Supreme Court, N. Y. 698; Warren v. Ætna Life Insurance Company of Hartford, 213 S. W. Reptr. 527.

*Joseph G. Magee,* for appellee.—Where all the parties were found dead at the same time, the victims of a common disaster, there is no presumption of survivorship. There was no sufficient legal evidence to show that the daughter survived the father in this case: 17 Corpus Juris, 1179; In re Lougk's Est., 26 American and English Annotated Cases 871; Gillespie's Est., 24 Pa. Dist. 376; Clymer's Est., 16 W. N. C. 36; Underwood v. Wing, 4 De Gex Macnaghten & Gordon's Reports, 633.

OPINION BY LINN, J., March 3, 1922:

Morgan Sweeney and his daughter Mrs. Kelly died in a common disaster. The question for decision arises in the distribution of Morgan Sweeney's property which has been awarded to his next of kin pursuant to the intestate law. Appellant claims the property as next of kin of Mrs. Kelly. As there is no presumption of survivorship, the burden of proof is on appellant to show that Mrs. Kelly survived and so became entitled to the property on the death of Morgan Sweeney. She has not furnished the measure of proof necessary to take property from A and transfer it to B. At most it may be said the evidence casts doubt upon the title by descent in Morgan Sweeney's next of kin, but that is not sufficient to divert the statutory devolution from one line to another; the sufficiency of the evidence is the single question before us.

The record shows that father and daughter and three others died by inhaling illuminating gas at some undetermined time between 12:30 a. m. and 10:05 a. m., January 19, 1920. They occupied a three-story house on the northeast corner of Seventh Street and Allegheny Avenue in this city. The gas entered the cellar from a broken gas main in the street. A witness described the street as "practically all ashes" and said "the gas percolated through the cinders and entered through the side walls," "through large crevices in the foundation walls from the Seventh Street side." The first floor front room apparently occupied the whole Allegheny Avenue width of the house and was used by John Kelly as a real estate office. Immediately north of this room and communicating with it, was their dining room. North of the dining room was a hall affording entrance to the house from Seventh Street. North of the hall was a kitchen; to pass from the kitchen to the dining room required crossing this hall. From the hall a stairway led to the second floor.

The second floor front room was the parlor; north of it was the bedroom of Mr. and Mrs. Kelly, a door opening between the two, (though there is no direct evidence that he occupied that bedroom that night) and north of that bedroom was a bathroom, accessible from the bedroom by a door. There was also a door from the bathroom into the second story hall. The northernmost room on the second floor was not occupied. From the second story hall a stairway led to the third floor.

The third floor front room was the bedroom of Morgan Sweeney. The room north of it was said to be the bedroom of Francis Kelly, (son of John Kelly by a former marriage). A door led from Morgan Sweeney's room to Francis Kelly's room. The rear third story room was occupied by Catharine McGonigle and was entered by a door from the hall.

The record seems to show that the entrance to the cellar was by a door opening under the stairway in the first floor hall. A window in Mrs. Kelly's second story bedroom was raised four or five inches; all the other windows in the house were closed. There is no evidence that any doors in the house were open except the door from the bathroom into the second story hall, the door from the hall into Catharine McGonigle's room on the third floor and perhaps the door between Morgan Sweeney's and Francis Kelly's room on the third floor. A Welsbach gas light was burning on the second floor hall and one gas light in the real estate office on the first floor and one in the third floor hall.

At 10 : 05 the house was opened and entered by the police and a physician and the occupants were pronounced dead by the physician. Mrs. Kelly was attired in her night dress, wearing bedroom slippers, and was lying on the floor partly in the bathroom and partly in the hall on the second floor. Morgan Sweeney and Catharine McGonigle were in their respective beds. John Kelly, dressed in his night clothes, lay on the floor of the room occupied by Morgan Sweeney; it was not clear where he

slept that night; it may or may not have been in the same bed with Morgan Sweeney in whose room he was found, for a witness said of Morgan Sweeney's bed "The other side of the bed looked as if some one had slept in it." Francis Kelly, wearing a bathrobe, was found at the foot of the stairs in the second floor hall, though his bedroom was on the third floor.

Heat flues led from the heater in the cellar to all these bedrooms except to Catharine McGonigle's room, which had no heat flue in it. The evidence does not show whether the registers of any of these heat flues were open or closed; there is nothing to show how they were constructed or in what condition they were. There were transoms over the doors and sufficient space under them for carpets, but the evidence does not show whether the transoms were open or shut, or whether the carpets filled the spaces under the doors. There were no heat flues in the halls. There is no evidence indicating whether the first floor was constructed tight enough to prevent gas collecting in the cellar from escaping through cracks into the first floor, or under or about the door opening into the cellar. There is no evidence showing how the heater was constructed and the heat flues attached, so that we cannot tell whether the air from the cellar went into these heat flues or whether there were cold air ducts by which the air would have been supplied from the outside and not from the cellar. The only witness who testified on this subject was a man who occupied the house afterwards and he said he did not know anything about the heater.

The door to Catharine McGonigle's room was open. When the physician stated that the parties were dead, one of the police officers instructed his subordinate as follows: "You know the orders of the department; take the first body he pronounced dead to the hospital"; accordingly the body of Mrs. Kelly was taken to a hospital, where it was again stated that she was dead. There was evidence that about 10:30 a relative of Morgan Sween-

ey's said his body was cold, and that a nurse from the hospital said the body of Mrs. Kelly was relaxed and warm; there was evidence that at 2:30 p. m. the bodies had in varying degrees a "blush" caused by such gas poisoning, and that Morgan Sweeney's had more "blush" than Mrs. Kelly's.   Morgan Sweeney was 77 years of age and there was evidence considered that for a two-year period antedating his death by about eight months, he was treated for bronchitis and myocarditis.   Mrs. Kelly was 48 years of age; John Kelly, 50; Francis Kelly, 17; Catharine McGonigle's age was not given. In the dining room on the first floor a parrot was alive in a cage covered with a sheet, though the evidence is that poisonous gas is more dangerous to birds and small animals than to human beings.   A woman who lived in the next house said that about four o'clock in the morning she "heard a fall" on the second floor of the Sweeney house, whether it was Mrs. Kelly or Francis Kelly, if either, is of course unknown.   At about "half past twelve to a quarter to one" in the morning a neighbor had talked with Mr. Kelly who was then "straightening up the kitchen."

The police officer who first entered the house did so by forcing the kitchen door and said "the fumes of gas were overpowering," that the "gas was overpowering in the whole house."   One officer immediately "got into the dining room and kitchen and went to the side door on Seventh Street" while another opened the windows as they went through the house.   A witness testified that death takes place sooner when such gas is inhaled in large quantities than if the same amount is taken in small quantities, though in any event some time is required; that the "process requires some minutes, if not hours, of continuous inhalation of gas."

Appellant's theory is that the gas, being lighter than air, rose from the cellar through the heat flues into the house, first filling the third floor and then the lower stories, thereby first overcoming the occupants of the

third floor; her learned counsel suggests that the positions in which Mrs. Kelly, her husband, John Kelly, and his son Francis Kelly were respectively found, indicate that they were overcome while attempting to escape the effects of the gas at a time (this is the argument as to Mrs. Kelly) when Morgan Sweeney was already dead. This claim that Mrs. Kelly survived is also supported, it is said, by the fact that she was much younger than her father, and was in good health while some eight months before he had been treated for illness already specified.

To establish the position of the learned counsel for appellant, it is necessary to assume the existence of a number of facts of which there is no proof, or to speculate by inferences from inferences in a manner prohibited by law (see cases cited in Mr. Justice SIMPSON's dissenting opinion, Gilmore v. Alexander, 268 Pa. 415, 425). When one asserts a title to property he must prove his title. We have already described the plan of the house as indicated by the record, and have suggested matters essential to support the hypothesis upon which appellant relies but as to which there is no evidence. Gas that has percolated through cinders in the bed of a street and crevices in the cellar wall would enter the house from the cellar at every crack or joint that was not absolutely tight. A policeman who entered when the house was opened was asked "Did the gas come up through the heat flues?" and answered "I don't know." Though the door from the first floor into the cellar was closed there is no evidence that the gas did not enter the house under or about the door. It may have. It does not appear whether there was a heat flue in the kitchen and yet when the officer entered he found the gas overpowering there. How and when did it get there? We do not have the evidence of the physician who entered with the police officers, as he died before the hearing.

The court in banc sustained exceptions to the adjudication, considering in detail the positions taken by the

learned auditing judge and now repeated in appellant's argument, and as our own study of the record has led to substantially the same conclusion, we take the following from the opinion of the court sustaining the exceptions: "The first element is that of the appearance of the body as indicated by a certain blush upon the same. This is explained by Dr. Trinkle as being present in cases of this kind, and he deduced the conclusion therefrom that, according to the degree of the blush present at the time of an inspection, it indicates the amount of gas inhaled, and as there was more blush on Sweeney's body than Mrs. Kelly's, he infers that Sweeney inhaled more gas than Mrs. Kelly.  As opposed to this it is in evidence that the blush gradually wears off after death, from which it can be fairly inferred that the lighter the blush the longer has the person been dead—and Mrs. Kelly had the lighter blush.  Furthermore, it cannot be presumed that one received the gas more quickly and in greater quantities than the other.  Dr. Trinkle did not see the bodies until 2:30 in the afternoon of the day in question,......The second element is that of the relative warmth of the bodies.  Sweeney's body was felt by Mr. Beirne about 10:30 in the morning, and was found cold.  It was testified that the day in question was a very cold day, and the windows in Sweeney's room on the third floor had been raised for a half hour, after entry into the house, in order to ventilate the room so that it would be safe for people to come into the same, and while it is a fact that Sweeney was in bed with bedclothes over him, we approach the question with the knowledge that the room was a very cold room.  Mr. Beirne, who felt Sweeney's body, is not shown to have had any knowledge as to what constitutes coldness or warmth in bodies, nor does he undertake to say what degree of coldness he found when he touched the body, nor do we know how warm or cold he was himself.  It is in evidence that it took a half hour to ventilate the house before he went up and placed his hands on Sweeney's

body. He might have been thoroughly chilled himself when he felt Sweeney's body, so that his sense of touch was not normal. Mrs. Kelly's body was taken to the Samaritan hospital in a patrol wagon, and there felt by one of the nurses of the hospital, who pronounced it warm. It is fair to assume, in the absence of evidence to the contrary, that Mrs. Kelly's body was brought into a room in the hospital comfortably heated, and we then have the body of Sweeney felt by a man in a cold room and pronounced cold, and the body of Mrs. Kelly, felt by a woman in a warm room and pronounced warm, with no other test applied as to the relative warmth or coldness of the bodies other than the personal touch under conditions so radically different, although at about the same hour—all of which warrant us in holding that the relative warmth and coldness of the respective bodies of Mrs. Kelly and Sweeney is so speculative and conjectural as not to warrant a definite conclusion as to who died first. Differences in temperament, power of observation, sensitiveness, and the like, of Sweeney, Mrs. Kelly, Beirne and the nurse, all add to the complication and confusion. If the temperature of the respective bodies is important, a thermometer applied by some one who understands what he is doing, under the same conditions, is the only method conceded by all as the proper one by which the temperature can be determined. The absence of activity about the house in the morning caused the neighbors about 10:05 a. m. to investigate, and they then found all the occupants of the house dead. Who can confidently say, by the feeling of the bodies by hand, who died first?

"As to Sweeney's room on the third floor being the warmest room in the house, we do not think there is sufficient evidence to find this as a fact. The only witness examined on the subject was Beirne, who now lives in the premises in question. He testifies that the heat from this heater runs even throughout the house. He does not testify of his own knowledge that, during Sweeney's life,

the latter's room was the warmest in the house, his testimony being 'they say' without saying who 'they' are. He further admits he knows nothing about heaters, or flues, and it does not appear whether the register in Sweeney's room was open or not.   Beirne's handling of the heater now is no test as to how the former occupants managed same.   The auditing judge, upon the assumption that Sweeney's room was the warmest room in the house, took the view that the gas coming in from the cellar was probably conveyed by the heater pipes leading from the furnace to Sweeney's room, and therefore there must have been more gas in Sweeney's room than elsewhere; but it must be remembered that illuminating gas was present on the second and third floors in sufficient quantities to kill all people located thereon, and that the maid's room on the third floor, where she was found dead, contained no register at all—and there is no evidence as to whether the registers were open or not.

"As to Sweeney's prior physical condition as indicating lesser power of resistance than Mrs. Kelly, the testimony offered tended to show that Sweeney had consulted Dr. Spiess for medical attention, and as Dr. Spiess was dead at the time of the audit, his widow produced a card from his records indicating that Sweeney had called on Dr. Spiess for medical attention beginning February 19, 1917, and ending April, 1919, fourteen visits in all.   Assuming, for the sake of argument, that this card was admissible in evidence (which may be doubted) we do not think it is entitled to much weight, for the reason that the last visit of Sweeney to the doctor was eight months prior to his being found dead, and it is uncertain and doubtful whether Sweeney's cessation of visits to the doctor were because he had been cured of his then ailment, or because one or both thought that Dr. Spiess could not further benefit him, or because Sweeney wished to avoid further expense.   Five visits, from September 15 to 28, 1918, were for a heart affec-

tion, and the remainder of visits were for bronchitis.
:. . . . . ."

The rule of the common law is "that where two or more persons perish in the same disaster, and there is no fact or circumstance to prove which survived, there is no presumption whatever on the subject.  None arises from considerations of age or sex, and the law will no more presume that all died at the same instant than it will presume that one survived the other.  It treats the case as one to be established by evidence, and lays the burden of proof on him who claims survivorship......
In the absence of evidence from which the contrary may be inferred, all may be considered to have perished at the same moment; not because that fact is presumed, but because, from failure to prove the contrary by those asserting it, property rights must necessarily be settled on that theory.  If there are other circumstances shown, tending to prove survivorship, courts will then look at the whole case for the purpose of determining the question, but if only the fact of death by a common disaster appears they will not undertake to solve it on account of the nature of the question, and its inherent uncertainty. It is not impossible for two persons to die at the same time, and when exposed to the same peril under like cir-cumstances it is not as a question of probability very unlikely to happen": 8 R. C. L., p. 716; see also 17 Corpus Juris, 1179, and 4 Wigmore on Evidence, section 2532, and authorities cited in notes 1 and 2.

As the parties to this appeal have no dispute about the legal rule, differing only about its application to the facts shown in the record, nothing can be gained by adding a discussion of the decisions cited to an opinion already perhaps too long.  It is certain that the parties received the gas in different situations.  It is not known whether they received it at the same time or in the same quantity.  It is not known how the gas got from the cellar into the house.  As there was no flue in Catharine McGonigle's room the gas could perhaps only enter that

room from the hall which had no heat flues, yet there is
no evidence that any door into the hall was open, except
perhaps the bathroom door unless that be considered to
have been opened by Mrs. Kelly at the time she suc-
cumbed to the effects of the gas at that point.   It can-
not be assumed that if the gas reached the third floor
bedrooms by the heat flues, it filled the hall by coming
over the transoms of the other third story bedrooms or
under the doors and then by means of the hall entered
Catharine McGonigle's room, and, though her survivor-
ship is not involved, and counsel for appellant says "it
is admitted that it would be impossible to show survivor-
ship as to the three active persons," the manner in which
the gas reached Catharine McGonigle's room is a proper
subject of investigation to test the conjectures proposed
by appellant as the basis for inferring that Mrs. Kelly
survived.   If there was no heat flue in the kitchen, how
did the gas in overpowering quantity, as described by the
police officer, get there?   If the gas came up under the
cellar door in the first floor, or if it came through
the floor at joints not tight, it could of course fill all the
halls from the first to the third floor, (perhaps being
fatal on the second floor before becoming so on the
third) thus accounting for the officers' testimony that
the halls were filled with gas.   If it be said that the gas
came into the halls from the bathroom after Mrs. Kelly
opened the door, another situation presents itself equal-
ly conjectural.   When the officers entered, they were on
the first floor and immediately opened that part of the
house to allow fresh air to enter.   That fresh air would
drive the gas in the lower part of the house to the upper
part, a fact which explains the statement of a witness
that between two and three o'clock when he was there,
he thought, with all the windows open, there was more
gas on the third floor than on the second; the police
officers said when they entered at 10:05, they were un-
able to say whether there was more gas on the third
floor than on the second floor.   The subsequent density

of gas on the third floor was doubtless due to the open-. ing of the lower floor windows for the purpose of admitting air. These and other similar observations suggest themselves as indicating that it is impossible for us to find in the record sufficient legal evidence on which to base the conclusion that Mrs. Kelly survived her father. "It necessarily follows" in the language of the Chief Justice in Home v. French, 187 U. S. 401, at 418, "that title did not prima facie vest in the son [daughter] who is not shown to have survived his mother [her father] and must be taken to have died at the same time. The property remained where it was vested, there being no evidence to show that it had been divested."

Where a husband and wife died by inhaling illuminating gas in circumstances held not to justify the inference that the wife survived the husband, the court said: "The situation suggests that the parties did not receive the gas in the same situation. Whether the husband was more exposed on the lounge permits discussion, but it is indicated that he exhibited evidences of life and consciousness of danger and effort to escape that are absent in the case of the wife. Whether such phenomena suggest that the husband tried to dress before his wife died is speculative, and yet an act of the living on his part is found, while none appears that concern the wife. So it may be argued that the gas did not act upon him while they were in a state of equal passivity, for one succumbed without, and the other with, a struggle to resist and to escape. The indication may be of slight value, but that is true of all data pertaining to the event. It touches too closely the realm of speculation to permit any certainty in decision. It is said the wife's body was warm and pliable, and the husband's was not, a condition consistent with her flesh and covering, and his exposure and anaemic condition. Dr. Hart felt competent to state that the husband was first to die, while Dr. Noble asserted that the ascertainment was beyond anybody's knowledge. The surrogate was unable to de-

Opinion of the Court.   [78 Pa. Superior Ct.

termine whether there was a priority of death, and I cannot find stable evidence on which to base a conviction. The event furnishes opportunity for subtle debate, but not stable facts on which may rest rights of property": In re Englebirt's Will, 171 N. Y. Suppl. 788. For a case in which the evidence was adequate to draw the inference of survivorship, see Robson v. Lyford, 228 Mass. 318.

The decree is affirmed, costs to be paid out of the estate.