## Kimmey's Estate.

Argued January 29, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Sidney E. Smith,* for appellant.

*Frank J. Strassner, Jr.,* and *Ulysses S. Koons,* with them *Edward J. Kirchner,* for appellees.

OPINION BY MR. JUSTICE LINN, March 22, 1937:

Harry S. Kimmey and his wife died at or about the same time without issue. Each left a will naming the other as beneficiary. At the audit of the account of the husband's estate, his wife's administratrix claimed it on the ground that she had survived him; his next of kin claimed on the ground that she did not survive, or that the proof failed to show that she survived. The contest therefore is between his next of kin and hers. If he predeceased his wife, his property passed by his will to her, and through her to her next of kin; but if she did not survive, it passed to his next of kin. The learned court below was of opinion that appellant had not proved that he died before his wife and awarded his estate to his first cousins. The appeal is on behalf of her next of kin.

Appellant agrees that the burden of proof was on her. The subject of controversy is the title to property. Title, apparently in one, is not to be divested by conjecture.

The eyewitnesses are not in complete agreement in their accounts of what they saw. Deductions directly opposed to each other are made by the parties with equal confidence. In such circumstances the court proceeds with caution; it makes its own inferences * and will stop when the footing becomes insecure; if at that point a claimant has not proved his title clear, the court will not dispossess another; a party must recover on his own title. The importance of reasonable certainty has been stressed in the so-called common disaster cases. In *Baldus v. Jeremias,* 296 Pa. 313, 317, 145 A. 820, we said: "Where, as here, two perish in a common disaster there is no presumption as to survivorship. While it may be shown by circumstantial evidence, like any other fact, yet the circumstances must be such as to satisfy reasonably well balanced minds of the existence of the

---

* *Miller v. Central Trust, etc., Co.,* 285 Pa. 472, 476, 132 A. 579.

fact sought to be established. . . . In the instant case the circumstances are so uncertain as to afford no basis for a conclusion, beyond a possible surmise. The rule is . . . that in the absence of substantial evidence warranting a definite conclusion as to survivorship of those perishing in a common disaster, they will be treated as dying at the same instant and property rights adjudged accordingly. . . ." See also *Sweeney's Estate*, 78 Pa. Superior Ct. 417.

On July 23, 1935, at about 4:15 o'clock, Kimmey was seen driving a Cadillac Sedan weighing over four thousand pounds northward from Portland, Maine. His wife was seated beside him. It was raining. The windows of his car were closed. The approach to Martin's Point Bridge was "down a hill of medium grade" on a curve to the left estimated at from 35 to 40 degrees. The accident occurred, a witness said, "right on the turn just before you get on to the bridge." The surface was composed of stone blocks laid in concrete. As Kimmey drove down the grade toward the bridge, a car approached from the opposite direction; it was occupied by a witness, Robertson, and his wife, who was driving. Mr. Robertson testified that Kimmey's car approached his at about 25 miles an hour, the same rate at which the Robertson car was moving, and that at or about the time the cars passed each other, "Mr. Kimmey slumped at the wheel and lost control and the car swerved and went over the precipice into the river." In cross-examination this witness admitted that in a deposition given in this case he described the occurrence in different words as follows: "Q. And you say he bent over—or fell over— toward Mrs. Kimmey? A. Yes. Q. All the way over? A. No. Q. He just leaned over slightly? A. Yes, slightly. Q. That is what you testified to at Portland; that is correct, isn't it? Answer yes or no. A. He leaned over toward Mrs. Kimmey. Q. Is that what you testified to at Portland? A. Yes. . . . Q. And that is correct, is it? A. Yes." If the cars were moving at the

rate of 25 miles an hour, Robertson's view of Kimmy's motions was limited to a very short interval. Several witnesses said there were skid marks on the road showing the course taken by the car to where it fell into the river. They differ whether there was one mark or two and as to the direction of the marks. Mr. Robertson, who got out of his car to render assistance, says that the skid mark was a single mark, 12 feet long, at right angles to the direction in which Kimmey was driving; others, who measured them, say there were two skid marks four or five inches wide and 48 feet long. These would indicate a forward skid. In referring to the skid of 48 feet the learned auditing judge said such a skid would indicate to him that Kimmey was going faster than 25 miles an hour. Witnesses testify that they heard the screech of the brakes; a witness said the brakes must have locked, though why, no one has discovered. The emergency brake was not on. When the car was taken out of the water, the left rear wheel was found locked; it does not appear whether that was the result of the fall over the precipice or was attributable to some other cause. The car went off the road and landed on a rocky ledge in five or six feet of water, the bottom of the river being 18 feet below the level of the road. It was completely submerged except half of the left rear wheel. Judging from the photograph showing the damage to the car, it appears to have landed directly on its front because the bumper and the front of both left and right fenders indicate impact on the rocky bottom. It came to rest on its top. A short time elapsed before it completely filled with water. Assistance was rendered almost immediately. The dead bodies of both were taken from the car after having been submerged about ten minutes.

Appellant contends that Kimmey died between the instant Robertson saw him "slump" or "lean over slightly" and the time he got into the water perhaps a second or so later.

For some years Mr. Kimmey had suffered from one or more forms of heart disease. On the day of the accident he had driven 228 miles; on the day before 240 miles. He had also been suffering with a bunion and had not slept well the night before. It may be that the movement of Mr. Kimmey's body, described by Mr. Robertson, indicated that he was then stricken with an illness of some sort and that he then lost control of the car. It may be, too, that he was not so stricken, and that his conduct was the result of driving conditions that suddenly confronted him. As he came over the top of the hill, he may have concluded that he was driving too fast for conditions as they appeared to him from that point and that he then concluded to check his speed in descending around the curve on the wet surface and for that purpose may have put on his foot brakes with sufficient violence to cause a forward skid, such as the marks on the road as described by all but Robertson, indicated as having taken place. In this view it is not only possible but very probable that the movement of his body described by Robertson, whether considered as "slumping" or as "leaning slightly" toward his wife, was Kimmey's movement in suddenly putting on the foot brakes. The road was only about 40 feet wide at or near the point where his car began to skid; in an instant it was off its course, over the precipice and in the water.

In support of the contention that Kimmey died before his wife, stress is laid on the evidence of the witnesses who removed the bodies from the automobile as it lay in the water. The doors of the car could not be opened until a rope was put about the rear axle and the car was raised enough to enable the rescuers to open them. A witness said there was less difficulty in extricating Kimmey's body, taken out first, than his wife's; it is argued that it must have contained more air and less water than hers and that therefore he must have been dead before he reached the water. To negative this suggestion, appellee calls attention to the evidence of one of the physi-

cians that if Kimmey was merely unconscious when he got into the water, he might take in very little water, and therefore the fact that his body was floated out of the car more readily than his wife's would not justify a finding that he was dead when he reached the water.

We have difficulty in understanding the evidence of Mr. McCaffrey, the witness who extricated the bodies. He was asked to state the position of Kimmey's body when he opened the door and answered: "The position of the body was out over the seat, the driver's seat, straight out. Q. Where was the head? A. The head was toward the back of the car. Q. Was the body lying on its back or stomach? A. The body was upside down facing toward me. I reached in. Q. Was it on its back? A. He was facing up towards me as I was down in, because I put my hand in and got him by the chin and pulled him out. Q. By that you mean he was lying on his back across the front seat? A. Yes. Q. His head was hanging down? A. Yes. Q. And as you looked in you could see his face? A. I could not see him, but I felt him; it was salt water and you could not see very well, it was dark. He was not coming out so good, so I had to swing his body around in the car." There is no evidence that the seat became loosened from its fastening. We cannot understand how the body could be "lying on his back across the front seat." As the car was upside down the seat was upside down also and appeared as if suspended from what might be called the ceiling of the space within the car. We may perhaps assume that between what had formerly been the top of the seat and what was now the floor of the car there would be a space of perhaps 15 inches. If the witness meant that the body was lying on what was now the floor of the car under the front seat so suspended from the ceiling, his description might be intelligible and we shall so consider it. It is not clear how Kimmey's body freed itself from where he had been seated behind the steering mechanism which would in some measure im-

pede his movement. Not only is it difficult to find support for appellant's inferences made from the evidence describing the removal of the bodies from the car, but, on the contrary, appellees deduce from it that Kimmey survived his wife. It may be natural to conclude that as this heavy car dashed through the fence and fell to the bottom 18 feet below the level of the road that the persons in the front seat would be moved about and would show some evidence of contact with parts of the car; both bodies were bruised, his across the chest and hers about the head. Now appellees argue that the fact that Kimmey's body was found free of the front seat, assuming that to be what the witness McCaffrey meant, supports the inference that after the car struck the bottom, but before it filled with water, Kimmey moved back from in front of the front seat to the back of the car where, and not until then, he was overcome with the water which filled it; they argue that because Mrs. Kimmey was found head downward in front of the front seat, where she might have been thrown by the action of the car, she died first, apparently without a struggle.

Attention was also called to the fact that during the efforts at resuscitation, very much less water came from Kimmey than from his wife. Mrs. Kimmey's body was in the water longer than her husband's. The fact that he did not take in more water while submerged, even assuming that he had some kind of stroke, is not sufficient to justify a finding that he was dead when the car left the road, because there is evidence to support the inference that, if unconscious, he would take in less water than a conscious person.

Mr. Robertson's evidence, is, however, consistent with the conclusion that Kimmey was not stricken by illness at the time he put on his brakes. Mr. Robertson saw the car skid; we cannot tell from the evidence whether Kimmey put on his brakes to stop the skid, or whether putting on the brakes caused the skid on the wet surface; but as the skid and the braking came so close to-

gether, if not at the same instant, we regard it as much more probable than not that he was conscious when he put on the brakes. There is no basis whatever to support the suggestion that his wife put on the foot brake, and as the emergency brake was on the driver's left side, she could not have reached that. If conscious at that time, at what moment in the short interval required to skid off the road into the river, did he die if suddenly stricken by heart disease? Unless this question can be answered from the evidence in the case the appellant has not sustained the burden of proof. While it is quite likely that one with his heart condition would die from the shock resulting from immersion in the cold water, the question is who died first. The evidence will not enable the court to say with any degree of certainty that Mrs. Kimmey was not affected in precisely the same way. The evidence of Dr. Wadsworth is clear that the time in which drowning takes place is not dependent upon the robustness of the person. He said: "There are so many problems in this matter of drowning, it becomes intensely intricate. The person who does not struggle much may not attempt to draw any air and may live for a little while longer. But a person who is quite nervous generally does not have the reactions, and sucks the water in quickly. So you may have a person practically drown in a minute or so, or he may be so entirely overcome that his respiratory center is not acting for a moment or two, and he just lies there (illustrating) ; then he takes a good breath in; there are so many thousands of methods whereby the mechanism can become upset and perturbed and the results vary, so that it requires a very definite thing to go by in order to say what we may mean and then what it does mean. You may say that in the ordinary sense of the term a robust person will withstand asphyxia longer; that is undoubtedly so. A person accustomed to swimming may not begin to drown for some time after they are submerged. A person not accustomed to water may be very much affected by the

temperature of the water. I never forget the first time that I went into that cold New England water."

In view of the evidence of the physicians we attach little importance to what is said in the argument about the differences in discoloration of the bodies of husband and wife as bearing on the question of who died first as presented in this record. The bodies were embalmed on July 23rd and were then sent to Philadelphia. Three days later a post-mortem examination was made by Dr. Wadsworth. He described a bruise across the chest which he thought must have been inflicted "after the circulation has become sufficiently lowered so that violence of that degree will not produce hemorrhage, which occurs only immediately before death or after death. Therefore, the marks as received must have been either at or after death." There is no evidence when the marks were received. Various suggestions are made. We are not impressed with the appellees' suggestion that the bruise was caused in getting the body from the water up on the top of the submerged car. It was probably the result of contact with the steering wheel while the car was falling over the precipice, but, in either view, it would have been caused "immediately before death or after death"; the fact cannot be made the basis of decisive inference.

Dr. Wadsworth was of opinion that Kimmey died of heart disease. He also thought that "if they [husband and wife] were both submerged at the same time and he only got the heart attack as he went toward and into the water he probably and in all probability would pass out sooner. If he was seen to have an attack before he reached the water or before the accident several seconds or practically part of a minute before he went in the water to collapse, I think the thing was clear." Another physician testified that "he died a heart death, a coronary death." A medical officer of the United States Coast Guard testified to some experience with drowning cases as "Beach Surgeon in Ocean City for many years."

He was of opinion that Kimmey drowned; that the amount of water described as having come from his body was sufficient to drown him.

It is not necessary to state the evidence in further detail. Enough has been recited to show how entirely speculative any inference must be as to whether husband or wife died first. The appellants are confronted with the rule that "in the absence of substantial evidence warranting a definite conclusion as to survivorship of those perishing in a common disaster, they will be treated as dying at the same instant and property rights adjudged accordingly." We must agree with the learned court below in holding that the wife's next of kin have not satisfied the standard of proof required.

The judgment is affirmed, costs to be paid out of the balance for distribution.