## Christensen Estate

*John L. Hamaker*, *H. Clay Burkholder*, and *Brown & Zimmerman*, for exceptants.

*Alfred C. Alspach*, for respondents.

BOWMAN, P. J., June 5, 1958.—The controversy involves the distribution of the property of a husband who, with his wife, perished in a common disaster.

On Saturday evening, August 4, 1956, Robert Schweitzer, accompanied by his wife, Bertha, A. L. Christensen and his wife, Laura, and Esther Demmy, was driving his Lincoln sedan west on State Highway Route 322 in Northern Lancaster County. At Mr. Schweitzer's right on the front seat sat Mr. Christensen. Occupying the rear seat were the three ladies, with Mrs. Schweitzer at the left, Miss Demmy in the center and Mrs. Christensen at the right. Their common destination was the Playhouse at Mount Gretna, Lebanon County. At approximately 7:30 p.m., the trip ended abruptly when, at the intersection of Route 322 and Route 501, in the village of Brickerville, the Schweitzer car collided with an automobile being driven by John Greshock and emerging from the last mentioned road. As a result of the wreckage

of crushed steel and broken glass, two of the five occupants in the Schweitzer car died. The dead were Mr. Christensen, aged 57 years, and Mrs. Christensen, aged 62 years.

Mr. Christensen, who died intestate, was survived by neither issue nor parents, but by his sister Anna and his brother Soren, citizens of, and residents in, Denmark. The pivotal question is whether he was also survived by Mrs. Christensen. On the ground that he was, there is claimed on behalf of the estate of his deceased wife Laura, who died intestate, a family exemption of $750, a spouse's allowance of $10,000 and one-half of the balance. On the ground that he was not, the entire estate is claimed by Mr. Christensen's sister and brother.

In the adjudication of November 27, 1957, of the first account of the administrator in the deceased husband's estate, the auditing judge held that there was no substantial evidence warranting a definite conclusion as to survivorship and awarded the balance before him for distribution, $2,729.18, to the surviving brother and sister of Mr. Christensen in equal shares. Exceptions to the adjudication were filed by the administrators of the estate of Mrs. Christensen, namely, Edwin G. Coldren and David S. Coldren, who contend that the court erred in not finding that Mrs. Christensen survived her husband and in not awarding the balance reflected by the account and adjudication to her administrators. Exceptions were also filed by Edwin G. Coldren, David S. Coldren and Elizabeth C. Hoagland, surviving collateral heirs of Mrs. Christensen. These exceptions are of similar contention. . . .

Dr. Yoder's testimony reflects his uncertainty. He testified that when he first saw Mrs. Christensen, he concluded she died instantly, that in view of her injuries it was not possible that she lived a longer period than Mr. Christensen, that there is a medical possi-

bility that Mrs. Christensen perished first and, to add to the uncertainty, he testified that there is a possibility that Mrs. Christensen might have outlived her husband. . . .

Whether or not Dr. Yoder arrived at the scene of the accident within 15 minutes after the collision, as he thought he did, or an hour thereafter, as the police officer testified, is of little moment. It is not disputed that Mr. Christensen and Mrs. Christensen were both dead when he arrived. What occurred and what was observed in relation to Mrs. Christensen prior to Dr. Yoder's arrival require careful consideration.

At the moment of the collision Susan W. Miller was sitting on the side porch of the residence of her son-in-law, Alton Reifsnyder. The home is located at a corner of the intersection, although the intersection of the two highways was not visible to her. She testified as follows: . . .

"A. Then I went right back to this other party. Q. Which other party? A. Mrs. Christensen, and then I built up pillows, and she just took a (indicating sigh) . . . Q. What did you see Mrs. Christensen do? A. Then she took a deep sigh; then I felt her pulse. Q. Did you feel her pulse after you saw her give this sigh? A. Yes. Q. Did she show any pulse? A. No. . . ."

At a continued hearing Mrs. Miller testified that she had been a practical nurse and in that work had seen many people die. Explaining further what she meant by the "sigh" to which she testified at the original hearing, she testified: "Q. What do you mean by a sigh? A. Breathing in and breathing out. Q. A short breathing in and breathing out? A. She drawed in and left it out."

We quote further from the adjudication: "Dr. Ward M. O'Donnell, pathologist and director of research at the Lancaster General Hospital, Lancaster, Pa., since

1951, called on behalf of Mr. Christensen's brother and sister, concluded that upon considering the injuries sustained by both the husband and the wife, he could not determine which one died first. He stated that it is not unusual for an exhalation of breath to occur after death and that such an exhalation will simulate a groan. He conceded that if there was an inhalation of air and an exhalation, the presence of life would be indicated. Dr. Howard Shaub, pathologist at St. Joseph's Hospital, Lancaster, Pa., called on behalf of the estate of the deceased wife, expressed the opinion that Mrs. Christensen survived 'a short interval.' In cross-examination he conceded that it was impossible to determine exactly which one survived. However, his final deduction was that in view of Mrs. Miller's testimony of an inhalation and exhalation of breath, Mrs. Christensen survived her husband."

The Uniform Simultaneous Death Act of June 19, 1941, P. L. 138, 68 PS §521, in section 1 thereof, provides: "Where the title to property or the devolution thereof depends upon priority of death and there is no sufficient evidence that the persons have died otherwise than simultaneously, the property of each person shall be disposed of as if he had survived, . . ."

Neither our own research nor that of counsel discloses any appellate court case in Pennsylvania defining the term "sufficient evidence" as used in this statute. Prior to that act the rules with respect to common disasters were stated in Baldus v. Jeremias, 296 Pa. 313, 317, 318: "Where, as here, two perish in a common disaster there is no presumption as to survivorship. While it may be shown by circumstantial evidence, like any other fact, yet the circumstances must be such as to satisfy reasonably well balanced minds of the existence of the fact sought to be established. . . . 'The preliminary question of law for the

court is, not whether there is literally no evidence, or a mere scintilla, but whether there is any that ought reasonably to satisfy the jury that the fact sought to be proved is established.' " See also Sweeney's Estate, 78 Pa. Superior Ct. 417; Kimmey's Estate, 326 Pa. 33.

In Saligman Estate, 13 D. & C. 2d 432, a husband and wife both died in a fire in their home. A physician who arrived at the home shortly after the fire was extinguished examined both bodies and was unable to determine from his observations who died first. A brother of the deceased wife who arrived at the scene before the fire was brought under control testified that while firemen were working on his sister with a Pulmotor he touched her and observed that she was breathing. He then went to his brother-in-law, who at the time was being given artificial respiration by another fireman. He likewise touched him, observed that he was cold and not breathing. While at no time did this witness observe his brother-in-law when artificial respiration was not being administered to him, it was held that the testimony of this single witness constituted sufficient evidence to establish the fact of survivorship of the wife.

It is urged upon us by counsel for exceptants in their carefully prepared brief that the Saligman case "almost completely squares with the present case." But there is this important and essential difference; in that case the single eye witness touched and examined both bodies and found the husband dead, the wife alive.

In Sauers v. Stolz, 121 Colo. 456, 218 P. 2d 741, the Supreme Court of Colorado stated, at page 742, with reference to section 1 of the Uniform Simultaneous Death Act:

"The statute is inapplicable if there is evidence as to which one of the parties survived the other or if there are particular circumstances from which the

fact of survivorship may be inferred. The presumption of simultaneous death of the parties was not intended to take the place of competent, positive and direct evidence, and the fact of survivorship requires no higher degree of proof than any other fact in the case."

In that case a husband and a wife were killed in a collision between an automobile, in which they were the sole occupants, and a truck. Two lay witnesses who arrived at the scene of the accident within two minutes of the crash examined both bodies. Both found no heart beat in the wife's body, whereas the husband's heart beat was perceptible and the profuse bleeding of his body was in spurts. It was held, in reversing the lower court, that the evidence was sufficient to establish the fact that the husband survived the wife.

The crux of this case is whether what Mrs. Miller observed was a mere groan or sigh after death, which according to the testimony of Dr. O'Donnell is not an unusual occurrence resulting from an exhalation of breath, or an actual *inhalation* and *exhalation* of air. The latter would denote life. When Mrs. Miller first testified, she said that Mrs. Christensen "took a deep sigh." She then looked for a pulse and found none. When, on direct examination, she was further asked whether Mrs. Christensen was breathing, her answer was: "Just like I say." Why, if Mrs. Christensen was breathing in the usually accepted meaning of the word, did this witness then not say so? Twenty-two days later at the continued hearing she again testified, but this time she said: "She breathed in and she breathed out." Apparently the breathing to which she referred at the continued hearing constituted one inhalation and one exhalation, since in cross-examination she testified: "Q. You went back to see Mrs. Christensen twice, is that correct? A. Yes, I pulled

her dress down, then I walked over to Mrs. Schweitzer, then I went back to this one, when she took that breathe in and breathe out." It is clear from Mrs. Miller's testimony that she endeavored only once to find a pulse. At the initial hearing she testified the sigh preceded the search for a pulse. At the continued hearing she testified: "And then . . . I felt her pulse and she just took a sigh." Since she found no evidence of a heart beat, if her later version is correct, Mrs. Christensen was dead when the sigh was observed.

While these observations of Mrs. Christensen were being made by Mrs. Miller, no one examined Mr. Christensen. Mrs. Miller was not aware that Mr. Christensen was in the Schweitzer car. Apparently Dr. Yoder was not certain that Mr. Christensen's injuries snuffed out his life instantly or permitted him to live for a time, however short. This becomes apparent from his testimony that although he was of the opinion that Mr. Christensen died instantly, he stated there was a medical possibility that Mrs. Christensen might have perished first.

We have carefully considered the evidence. Permeating the testimony is evidence which leads to an inevitable conclusion that it is difficult to determine that a fracture of the neck is less likely to cause instantaneous death than a severe fracture of the skull. The testimony of Mrs. Miller at the continued hearing with respect to the breathing she claimed to have observed in Mrs. Christensen is neither impressive nor convincing. The testimony of the two pathologists established nothing beyond the accepted fact that as long as one inhales air and exhales air, there is evidence of life. We are unable to find sufficient evidence that these two unfortunate victims died otherwise than simultaneously. As stated in the adjudication, any other conclusion would be entirely speculative.